**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**C & I AIR CONDITIONING, INC., Respondent.**

**No. 72–1374.**

United States Court of Appeals, Ninth Circuit.

Oct. 30, 1973.

Douglas S. McDowell (argued), Peter G. Nash, Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, Robert E. Williams, NLRB, Washington, D.C., Roy O. Hoffman, Director, Region 20, NLRB, San Francisco, Cal., for petitioner.

Arthur K. Lund (argued), of Rankin, Oneal, Center, Luckhardt, Booney, Marlais & Lund, San Jose, Cal., for respondent.

Before BARNES and TRASK, Circuit Judges, and THOMPSON,* District Judge.

TRASK, Circuit Judge:

The National Labor Relations Board petitions this court for enforcement of its order based on its determination that the company had engaged in an unfair labor practice in violation of section 8(a)(1) of the National Labor Relations Act. The alleged violation was the discharge of an employee for concerted activity protected by section 7. The issue presented is whether substantial evidence supports the Board's finding that Douglas T. Martin was engaged in protected concerted activity which led to his discharge because he "voiced a series of complaints relating to working conditions at the job on which he was employed."

Douglas T. Martin was discharged from his work with C & I Air Conditioning, Inc. (C & I) on December 5, 1969, assertedly because his work had slowed down. The Board concluded the reason for his discharge was that he had voiced complaints concerning safety on the job site. This conduct amounted to protected concerted activity, according to the Board, because Martin's complaint was related to safety conditions on the job and was consistent with his rights set forth in the collective bargaining

---

* Honorable Bruce R. Thompson, United States District Judge for the District of Nevada, sitting by designation.

agreement his labor union had with his employer. Martin, a member of the Sheet Metal Workers' Union, obtained work through the union with C & I in August 1969 installing heating and air conditioning units at a construction project in San Jose, California. C & I was the subcontractor on the project for McKeon Construction. Three days before his discharge, Martin and a co-worker were carrying a heating unit to an upstairs apartment when the temporary stairway they were using collapsed. Martin's co-worker sustained injuries in the accident. Martin immediately approached Stanley W. Smith, McKeon's general superintendent, and voiced his complaint about the unsafe condition of the temporary stairs. He declared that he would not carry furnaces up the stairs any more unless they were secured in place permanently. Smith replied, "Well, if you don't want to carry the furnaces up the stairs, then get off my job." (R.T. at 49). Martin agreed, "Okay, I will." He did not, however, quit the job. Smith testified that he reported this incident to C & I's project manager, Elwyn S. Dubey, and indicated that Martin had threatened to quit.

We deny the Board's petition for enforcement based on our conclusion that there was no substantial evidence to establish the employee had engaged in protected concerted activity. Section 7 provides:

"Employees shall have the right . . . to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection."

Our circuit has indicated that the term "concerted activity" means that the employee must be acting "with or on behalf of other employees, and not solely by and on behalf of the discharged employee himself." Pacific Electricord Co. v. NLRB, 361 F.2d 310 (9th Cir. 1966). We are unable to find any evidence that Martin's complaint was made for the purpose of mutually aiding and protecting any employees other than himself.

We do not disagree in principle with the rule stated by the Second Circuit in NLRB v. Interboro Contractors, Inc., 388 F.2d 495, 500 (2d Cir. 1967) that:

"[W]hile interest on the part of fellow employees would indicate a concerted purpose, activities involving attempts to enforce the provisions of a collective bargaining agreement may be deemed to be for concerted purposes even in the absence of such interest by fellow employees."

Other circuits have adopted the *Interboro Contractors* rationale in finding protected concerted activity although the discharged employee was acting by himself. *See, e. g.,* NLRB v. Ben Pekin Corp., 452 F.2d 205 (7th Cir. 1971). *Contra,* NLRB v. Northern Metal Co., 440 F.2d 881 (3d Cir. 1971). We recognize the emergence of that rule but fail to see any evidence showing that the purpose of Martin's conduct was for the "mutual aid and protection" of other employees, or that it was an attempt to enforce the provisions of a mutual bargaining agreement. In our opinion Martin's complaint was an individual protest "on behalf of the discharged employee himself."

A close consideration of Martin's conduct, alleged to amount to protected concerted activity, convinces us that this situation is distinguishable from those cases where courts have applied the *Interboro Contractors* rationale, and we therefore do not reach the problem. Edward B. Miller, Chairman of the NLRB, stated the distinction in his dissent to the Board's Decision and Order:

"I cannot agree with the result reached by my colleagues here. In *Interboro Contractors, Inc., supra,* cited in the majority opinion, the Board held that complaints made by an individual in an attempt to enforce the provisions of a collective-bargaining agreement were concerted activity protected by Section 7. The rationale for that holding, as expressed in an earlier case, was that 'implementation of such agreement by an employee is but an extension of the concerted ac-

tivity giving rise to that agreement.' [Bunney Bros. Construction Company, 139 NLRB 1516, 1519.]

". . . Without at this time passing on the theory of *Interboro,* I find my colleagues' decision here to go considerably beyond the decision in that case. In *Interboro,* the discharged individual designated the collective-bargaining agreement as the source of his claimed rights. In the present case . . . [t]here is no evidence he made any reference to the collective-bargaining agreement, or even that he knew there was one, or that he was seeking in any way to implement its terms . . . . The majority's opinion demonstrates only that Martin *might* have taken concerted action, or *might* have made a claim under the collective-bargaining agreement, had he thought of it. But the fact is there is no evidence that he did. Under these circumstances, the finding that the employee's complaints were 'concerted' activity is based upon such remote and unsupported inferences that I must dissent from the majority in this respect." C.T. at 53–54.

We share the dissenting Board Chairman's view and thus refuse to enforce the Board's order.

We might note further that Martin's complaint regarding the stairs was related to an isolated incident. Martin was never asked to go up improperly secured stairs on any other occasion. Moreover, his complaint was merely an off-the-cuff remark directed to the job site foreman of the general contractor, who was not directly related to Martin's employer, C & I. That afternoon Martin talked to supervisors from his own company but he did not raise a complaint. Finally, there is not a scintilla of evidence that Martin intended to implement rights under the collective bargaining agreement. Martin's answers to questions by the trial examiner are illuminating on these matters:

"TRIAL EXAMINER: I have a couple of questions.

Q. (By Trial Examiner:) How often did you carry furnaces up stairs?

A. In a week we just did it, in a week, roughly about 30 furnaces, I'd say.

Q. And how many stairs were blocked rather than nailed?

A. Only about, to my knowledge, only the last three buildings.

Q. And how many furnaces had you carried up those last three buildings?

A. I think I only carried up the one, the building where they had fallen.

Q. How many, did you carry any furnaces up any other stairs that were blocked?

A. Not to my knowledge. Most of them were all in place, finished homes.

Q. This was the only one, then, that was blocked?

A. That I know of sir, yes, sir. There was about six of us taking furnaces up.

Q. Well, you've worked in other projects, haven't you?

A. Yes, sir.

Q. Were they blocked or nailed?

A. They're always nailed.

Q. Always nailed?

A. Usually always nailed, sir.

Q. This was the first time you came across a blocked stair?

A. Yes, sir.

Q. Well, after you told them that you wouldn't go up the stairs any more that were blocked, who did you tell that to?

A. To Stan Smith, the McKeon Construction foreman.

Q. Did you tell it to Mr. Dubey?

A. No, sir.

Q. Did they ever ask you to go up those stairs again? That were blocked, stairs that were blocked, with a furnace?

. . . . . .

A. No, sir.

. . . . . .

Q. Did you file a grievance about the stair condition, condition of the stairs with your Union?

A. No, sir.

Q. Why not?

A. I didn't know I could. I didn't know you could do anything.

Q. You're a member of the Union?

A. Yes, sir.

Q. Did you ever read the Union contract?

A. Yes, sir.

Q. Did you know that the contract provides for adjustments of grievances?

A. I was under the impression it was something when it was done wrong.

Q. What do you mean 'done wrong'?

A. Something like you're in an accident, or you're fired illegally, or something of that nature.

Q. Well, isn't that what you're alleging here? That you were fired illegally?

A. Yes, sir.

Q. And the conditions were unsafe? Doesn't the contract provide for safe working conditions?

A. Yes, sir. I didn't know what safe working conditions consisted of. My booklet—I didn't read through it, and didn't understand.

Q. The point is, you didn't file a grievance?

A. No, sir.

TRIAL EXAMINER: I have no more questions." R.T. at 75–78.

We agree that, under these circumstances, Martin did not engage in conduct amounting to protected concerted activity. Not only was he acting by himself, as were the employees in *Interboro Contractors* and related cases, but he was also acting *for* himself. We fail to see that his actions were meant to be for the mutual aid and protection of any others.

The Board's order is set aside and will not be enforced.